**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| CHINA TELECOM (AMERICAS) CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:20-cv-1545 (CMH/TCB) |
| ) | |
| INTERNET KEEPER GLOBAL (GROUP) ) | |
| CO. LTD., *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on Plaintiff China Telecom (Americas) Corp.'s

("Plaintiff" or "CTA") Motion for Default Judgment.[1] (Dkt. 17.) For the reasons articulated

below, the undersigned U.S. Magistrate Judge recommends that the Court grant Plaintiff's

motion.

### I. BACKGROUND

**A.      Procedural Posture**

Plaintiff filed this lawsuit against Defendants Internet Keeper Global (Group) Co. Ltd.

("IKG (Group)") and Internet Keeper Global (USA) Co. Ltd. ("IKG (USA)") (collectively,

"Defendants") on December 18, 2020 for breach of contract (Count I), and, in the alternative,

account stated (Count II), unjust enrichment (Count III), and quantum meruit (Count IV). (Dkt.

1.) Plaintiff also sought declaratory judgment for: (1) joint and several liability (Count V);  (2)

---

[1] The relevant filings before the undersigned include Plaintiff's Complaint (Dkt. 1) ("Compl.");
Plaintiff's Motion for Default Judgment ("Mot. Default J.") (Dkt. 17); Plaintiff's Memorandum
in Support of Motion for Default Judgment ("Mem. Supp.") (Dkt. 18); and all attachments and
exhibits submitted with those filings.

alter ego status and fraud subject to a remedy of corporate veil piercing (Count VI); and (3) removal or liquidation of equipment left on premises (Count VII). *Id.*

After Defendants failed to enter an appearance or respond in any fashion, Plaintiff requested the clerk's entry of default on March 19, 2021. (Dkt. 15.) The clerk then entered default against Defendants on April 2, 2021. (Dkt. 16.) Plaintiff filed the instant motion for default judgment on May 12, 2021 (Dkts. 17-18) and set the matter for a hearing on Friday, May 28, 2021 (Dkt. 19). Representatives for Defendants failed to appear or otherwise respond at the hearing, and the Court took this matter under advisement for the undersigned to issue this Report and Recommendation.

### B.    Jurisdiction and Venue

Before the Court can render default judgment, it must have subject-matter and personal jurisdiction over the defaulting parties, and venue must be proper.

*First*, the Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1)-(2). A federal district court has subject-matter jurisdiction when a dispute involves "citizens of different States" or "citizens of a State and citizens or subjects of a foreign state" and the amount in controversy "exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a)(1)-(2). Here, Plaintiff is a Delaware corporation whose principal place of business is located at 607 Herndon Parkway, Suite 201, Herndon, VA 21070. (Compl. ¶ 1.) Accordingly, Plaintiff is a citizen of Delaware and Virginia. Defendant IKG (Group) is a citizen of China, as it is incorporated and headquartered in Hong Kong. (Compl. ¶ 2.) Finally, Defendant IKG (USA) is a California citizen because it is incorporated in California and its principal place of business is at 250 Stockton Avenue, San Jose, CA 95126. (Compl. ¶ 3, Ex. A.) Additionally, Plaintiff seeks relief beyond $75,000.00 in the complaint. Accordingly, the Court has diversity

2

jurisdiction over this action.

  *Second*, the Court has personal jurisdiction over Defendants. The standards of federal due process and the forum state's long-arm statute must be satisfied for a federal court to have personal jurisdiction over a party. *See Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 301 (4th Cir. 2012). Federal due process permits personal jurisdiction where a defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Further, "a defendant should be able to anticipate being brought to court in the forum, in that the contacts must be directed at the forum state in more than a random, fortuitous, or attenuated way." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 176 (4th Cir. 2002). Virginia's long-arm statute, Virginia Code section 8.01-328.1, provides for personal jurisdiction to the extent that federal due process permits. *Id.* With federal due process and Virginia's long-arm statute requiring the same standard, essentially only one inquiry is required. *See id.*

  Furthermore, a court may either have specific jurisdiction, which arises when the defendant's contacts with the forum state give rise to the basis of the lawsuit, or general jurisdiction, which arises when the defendant is domiciled in the forum state or if the defendant has affiliations with the state that are so "continuous and systematic" as to render the party "essentially at home." *Fireclean LLC v. Tuohy*, No. 1:16-cv-294-JJC-MSN, 2016 WL 4414845, at *2 (E.D. Va. June 14, 2016) (citation omitted); *see also Tire Eng'g*, 682 F.3d at 301 (citation omitted).

  Here, the Court has specific jurisdiction over Defendants based upon the parties' forum selection clause, which provided:

> The Parties agree that any action related to this Agreement shall be brought and maintained only in a Federal or State court of competent jurisdiction located in the Eastern District of Virginia. The parties each consent to the jurisdiction and venue of such courts and waive any right to object to such jurisdiction and venue.

(Compl. ¶ 5, Ex. B at 12.) Virginia's long-arm statute confers jurisdiction over a defendant who transacts any business in Virginia. V.A. Code Ann. § 8.01-328.1(A)(1). Accordingly, Defendants have availed themselves to this Court's specific jurisdiction.

*Lastly*, Plaintiff filed this lawsuit in the proper venue. Under 28 U.S.C. § 1391(b), venue is proper in a judicial district (1) "in which any defendant resides, if all defendants are residents of the State in which the district is located; or (2) "in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(1)-(2). Here, venue is proper under the second provision, as the parties agreed to the aforementioned forum selection clause. (Compl. ¶ 5.)

## C.   Service of Process

Before the Court can render default judgment, it must be satisfied that the defaulting parties have been properly served.

### 1.   Proper Service on IKG (USA)

Under Federal Rule of Civil Procedure 4(h)(1)(B), a plaintiff can serve a foreign or domestic unincorporated association "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(h)(1)(B). Turning to Rule 4(e)(1), the provision allows service by "following state law . . . where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1). Under Virginia code section 8.01-301, "personal service on any officer, director, or on the registered agent of a foreign corporation" is proper. Va. Code Ann. § 8.01-301.

4

Here, Plaintiff, by private process server, served IKG (USA) on January 5, 2021. (Dkt. 10.) Plaintiff submitted an affidavit of its private process server, which stated that "on 01/05/2921 at 11:31 A.M., I served Internet Keeper Global (USA)...by serving Eugene Cheng...authorized to accept service." (*Id.*) Upon review of the affidavit and applicable law, the undersigned is satisfied that Plaintiff effected proper service on IKG (USA).

2.     Proper Service on IKG (Group)

Federal Rule of Civil Procedure 4(h)(2) provides for service "at a place not within any judicial district of the United States, in any manner prescribed by Rule 4(f) for serving an individual[.]" Fed. R. Civ. P. 4(h)(2). Rule 4(f) allows for service on any competent adult "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial Extrajudicial Documents[.]" Fed. R. Civ. P. 4(f)(1).

Plaintiff's private process server properly effectuated service on IKG (Group) on January 21, 2021 in Hong Kong pursuant to Article 10(b) of the Hague Convention on the Service Abroad of Judicial and Extra Judicial Documents. (Dkt. 15 at 1-2.) Plaintiff again filed an affidavit of service, in which Plaintiff's private process server stated: "I left the summons at the individual's residence or usual place of abode with Miss Yip – Staff, a person of suitable age and discretion who resides there, on 1/21/21 and mailed a copy to the individual's last known address...[and] I served the summons to Miss Yip[.]" (Dkt. 12.) Accordingly, the undersigned finds that Plaintiff properly served IKG (Group).

II. FINDINGS OF FACT

Upon a full review of the pleadings and record in this case, the undersigned finds that Plaintiff has established the following facts.

5

## A.    Defendants Order Plaintiff's Services

IKG (Group), through its affiliate Hostspace Networks, LLC, began ordering CTA's telecommunications services in October 2012.[2] (Compl ¶ 12, Exs. D-E; Mem. Supp. at 3.) CTA now requests payment for eight overdue invoices for services pertaining to over one hundred of Defendants' service orders. (Compl. ¶ 17.)

Each service order contains a Customer Declaration and Approval, which states that "[b]y signing this Order Form, the Customer agrees that it will accept, use and pay for the Services described in this Order." (Compl. ¶ 18, Ex. L.) Additionally, most of the service orders provide that the customer "will accept, use and pay for the Services described in this Order and subject to the terms and conditions of that Master Services Agreement ("MSA") executed by CT Americas and Customer on _____, or in the absence of an MSA to CT Americas' General Terms and Conditions available at http://ctamericas.com/files/CT_Americas_General_Terms_Conditions.doc."[3] (Compl. ¶ 19, Ex. L.) Although not all of the service orders at issue contained mention of Plaintiff's terms and conditions, Plaintiff contends that the parties "carried out and paid for the services in accordance with" CTA's terms and conditions. (Compl. ¶ 20.) Moreover, Plaintiff alleges that "[a]t all times relevant to this matter" Defendants' service orders, CTA's terms and conditions, and the parties' invoices constituted a legally enforceable contract. (Mem. Supp. at 3.)

---

[2] Hostspace Networks, LLC is a California limited liability company. (Compl. ¶ 13, Exs. F, G, H.) In March 2019, IKG (USA) emailed CTA to change its Hostspace account name to Internet Keeper Global (USA) Co., Limited. (Compl. ¶ 16, Ex. K.) Defendant IKG (USA) was incorporated in California on May 14, 2018. (Compl. ¶ 15, Exs. A, J.)
[3] In many of the service orders at issue "Hostspace Networks LLC" is written in the blank space. (Compl. ¶ 19, Ex. L.)

### B.    Key Provisions of CTA's Terms and Conditions

CTA's terms and conditions contain the following provisions most pertinent in the instant

dispute:[4]

- <u>Invoices.</u> CT Americas will invoice the [Monthly Recurring Charges] on a monthly basis in advance. (T&C § 3.2.)

- <u>Due Date.</u> Customer shall make all undisputed payments on or before the date that is (30) calendar days after the invoice date ("Due Date"). (T&C § 3.3.)

- <u>Late Payment Penalties.</u> [I]f customer fails to pay any undisputed amount on or before the Due Date, CT Americas may charge interest on the unpaid balance from the Due Date until the date paid at the nominal rate of 1.0% per month, compounded monthly, or the highest rate permitted by applicable law, whichever is lower. (T&C § 3.6.)

- <u>Billing Disputes.</u> If Customer reasonably disputes any matter contained in any invoice, the Customer may withhold payment of the disputed portion but shall pay the undisputed portion of the invoice. Written notice regarding any dispute as to an invoice and a detailed explanation as to the reasons therefor must be provided to CT's Americas' Finance Department on or before the Due Date of the subject invoice. (T&C § 4.1.)

- <u>Suspension by CT Americas.</u> CT Americas may suspend Service…in the event that Customer is in Default, and has failed to remedy such Default within ten (10) days of receipt of written notice.[5] (T&C § 13.1.)

- <u>Termination by CT Americas.</u> CT Americas may terminate a Service…upon written notice if any cause of suspension of such Service under Section 13.1 continues uncured after sixty (60) days. (T&C § 13.2.)

- <u>Termination Payment.</u> In the case of termination of this Agreement of any Service…by CT Americas under 13.2(i) or 13.3(i) for Customer's Default, Customer shall remain liable to pay CT Americas an amount equal to the [Monthly Recurring Charges] for the remainder of the term of that Service as set forth in the Order ("Termination Payment"), plus any third party charges not already covered by the Termination Payment. (T&C § 13.4.)

---

[4] The Standard Terms and Conditions for Service Ordered from China Telecom (Americas) Corporation ("T&C") are attached as Exhibit B to Plaintiff's Complaint. (Dkt. 1-2.)

[5] The Terms and Conditions define "default" as "the failure of a Party to perform a material obligation of this Agreement; provided that any incidence of interruption, unavailability or degradation of Service or other failure to achieve an objective set forth in a Service Level Agreement shall not be considered a Default." (T&C at 14.)

- <u>Order by Customer Affiliates.</u> Customer's Affiliates may purchase Services under this Agreement by submitting an Order. Upon acceptance of an Order by CT Americas, any Customer Affiliate that purchases services under this Agreement shall be bound by the terms and conditions to the same extent as Customer; provided, however, that Customer shall be jointly and severally liable for all claims and liabilities arising under this Agreement related to any Order accepted from any Customer Affiliate, and any event of default under this Agreement by the Customer Affiliate with respect to such Order shall also be deemed an event of default by Customer. (T&C § 1.3.)

- <u>Enforcement.</u> Each Party shall be responsible for all costs and expenses, including attorneys' fees and expenses and court costs, incurred by the other Party in the enforcement of the payment obligation of any undisputed amounts under this Agreement and the collection of outstanding amounts due hereunder. (T&C § 3.9.)

(*See* Compl. ¶¶ 21-33; Mem. Supp. at 3-4.)

### C. Defendants' Default Due to Failure to Pay Invoices

Defendants paid or responded to CTA's invoices until July 2020, though CTA alleges that it often reminded Defendants to pay overdue balances. (Compl. ¶ 37.) Defendants' last payment to CTA was on September 3, 2020, and the $365,696.25 payment constituted partial payment for invoices not at issue in this action. (Compl. ¶ 40, Ex. Q.) Further, this payment was made by a third-party at the request of the wife of Mr. Qianjing Zhou, who is the CEO of both Defendants. (Compl. ¶ 41.) The partial payment resulted in $90,119.88 exceeding Defendants' June 2020 balance, but Defendants did not designate whether the excess should be credited to IKG (Group)'s or IKG (USA)'s account, so CTA applied it to IKG (USA)'s July 2020 invoice. (Compl. ¶ 42.)

Defendants then failed to pay their invoices for July through October 2020 within thirty days, as required by the Terms and Conditions. (Compl. ¶ 43.) Nor did Defendants contest any of the invoices, and the time to do so has also passed. (*Id.*)

CTA issued their first notice of overdue invoices to Defendants on August 8, 2020. (Compl. ¶ 46, Ex. S.) Defendants replied the next day and proposed deferred payment plan dates,

8

to which CTA did not agree or accept. (*Id.*) When CTA had not received payment weeks later, it sent both Defendants another more detailed notice on August 31, 2020. (Compl. ¶ 48, Exs. T, U.) These second notices stated, among other things, that "we are sending this Second Notice to Confirm that the process for termination of Service subject to the Order has been initiated." (*Id.*) On September 16, 2020, CTA issued a "Final Demand Letter" addressed to both Defendants. (Compl. ¶ 49, Exs. V, W.) The letter stated that it "is a final demand for payment of overdue amounts before we suspend the services provided to your accounts" and included a summary of all invoices and payments, which showed an outstanding balance of $1,635,252.87. (*Id.*)

CTA began to suspend service on September 24, 2020, suspending four of Defendants' six circuits.[6] Finally, on October 7, 2020, CTA issued a Final Service Suspension Notice to both Defendants. (Compl. ¶ 51, Exs. X, Y.) In this final notice, CTA informed Defendants "[i]f we do not receive payment of the full outstanding amount of $1,635,252.87 within the next 24 hours, we will suspend all remaining services to your accounts." (*Id.*) When Defendants still had not paid two days later, CTA sent them a Service Termination Notice stating that Defendants' accounts 'designated as CTAE000349-00 and CTAE002141-00 have been suspended and/or terminated due to lack of payment. (Compl. ¶¶ 52, 54-56, Exs. R, Z, AA.) Defendants did not respond to the final notices and CTA terminated all of its services to Defendants on November 14, 2020. (Compl. ¶ 53.)

In total, CTA alleges that IKG (Group) owes a total of $1,178,312.96 - plus termination payments, late payment penalties, third-party costs, and interest - for invoices with due dates from July 31, 2020 to October 31, 2020. (Compl. ¶¶ 60-64.) Similarly, CTA claims IKG (USA)

---

[6] Plaintiff alleges that Defendants certainly knew of the suspension, as the remaining two circuits would have become congested, "resulting in slower speeds for its end users," eventually leading to service failures. (Compl. ¶ 50.)

has an outstanding balance of $991,886.29 - plus termination payments, late payment penalties, third-party costs, and interest - for invoices with due dates from July 31, 2020 to October 31, 2020. (Compl. ¶¶ 68-72.)

> **D.    IKG (Group) and IKG (USA) Are Interconnected**

CTA alleges that Defendants act as a single entity and so both are liable in this matter. As noted above, Mr. Zhou is the CEO for both IKG (Group) and IKG (USA). (Compl. ¶ 41.) Additionally, CTA sent invoices to both IKG (Group) and IKG (USA) through a single email address: billing@ik.com. (Compl. ¶ 38; Exs. N, O, P.) Further, when either defendant wired payments to CTA, the designated sender was Internet Keeper Global, and the payments originated from the same bank account. (Compl. ¶ 39.)

> III. Evaluation of Plaintiff's Complaint

When a defendant has defaulted, the well-pleaded allegations of facts set forth in the plaintiff's complaint are deemed admitted. *JTH Tax, Inc. v. Grabert*, 8 F. Supp. 3d 731, 736 (E.D. Va. 2014) (citing *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001)). However, the defaulting party is not deemed to admit conclusions of law or "allegations regarding liability that are not well-pleaded." *Balt. Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 540 (D. Md. 2011) (internal quotation marks and citations omitted)). As a result, before entering default judgment, the Court must evaluate the plaintiff's complaint against the standards of Federal Rule of Civil Procedure 12(b)(6) to ensure that the complaint properly states a claim upon which relief can be granted. *GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. 2003).

Here, CTA brought claims against Defendants for breach of contract (Count I), and, in the alternative, account stated (Count II), unjust enrichment (Count III), and quantum meruit

10

(Count IV). (Dkt. 1.) Plaintiff also sought declaratory judgment for: (1) joint and several liability (Count V);  (2) alter ego status and fraud subject to a remedy of corporate veil piercing (Count VI); and (3) removal or liquidation of equipment left on premises (Count VII).[7] (*Id.*) The undersigned will address each count below.

### A.    Breach of Contract (Count I)

CTA's first count alleges breach of contract against Defendants for breach of CTA's Terms & Conditions, service orders, and invoices. (Compl. ¶¶ 74-89.) Under Virginia law, a plaintiff must show three elements to successfully bring a claim for breach of contract: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation;" and (3) "injury or damage to the plaintiff caused by the breach of obligation." *Squire v. Va. Hous. Dev. Auth.*, 758 S.E.2d 55, 60 (Va. 2014) (quoting *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).

*First*, CTA must establish that IKG (Group) and IKG (USA) had a legally enforceable obligation to it. CTA alleges that "[a]t all times relevant to this matter, a contract existed between the CTA and IKG (Group) comprised of IKG (Group)'s service orders, CTA's T&Cs, and associated invoices...Likewise, a contract existed at all times relevant between CTA and IKG (USA) comprised of IKG (USA)'s service orders, CTA's T&Cs, and associated invoices." (Compl. ¶ 76; Mem. Supp. at 4.) These documents required Defendants to pay all balances within thirty (30) days of each invoice, or to dispute the amounts stated, in exchange for CTA's services. (T&C §§ 3.2, 3.3.) This obligation is further explained on each of CTA's many invoices at issue in this matter. (Compl. ¶¶ 18, 19, Ex. L.) Further, the parties performed under terms of

---

[7] CTA argued in its complaint that its "claims are straight-forward and likely will be uncontested." (Compl. ¶ 6.)  CTA noted that as of August 2020, many of IKG (Group)'s senior executives were detained in China due to violations of China's internet gambling laws. (*Id.* ¶ 73.)

CTA's service orders, invoices, and Terms and Conditions for many years.

Accordingly, upon review of the documents at issue, the undersigned determines that Defendants had legally enforceable obligations to CTA.

*Second*, CTA must demonstrate that Defendant breached its legal obligations. As discussed above, CTA's Terms and Conditions clearly stated that, in exchange for services, Defendants "shall make all undisputed payments on or before the date that is [thirty] (30) calendar days after the invoice date ("Due Date"). (T&C § 3.3.) And, the service orders clearly referenced these terms and conditions and further clarified that "[b]y signing this Order Form, the Customer agrees that it will accept, use and pay for the Services described in this Order." (Compl. ¶¶ 18, 19, Ex. L.)

Defendants submitted hundreds of service orders to CTA. In return, CTA provided its services to Defendants and Defendants met their obligations under CTA's Terms and Conditions, service orders, and invoices until July 2020. At this time, however, Defendants ceased to meet their obligations, despite CTA's numerous notices, and have not paid their outstanding balances. As a result, the undersigned finds that Defendants breached their payment obligations to CTA.

*Finally*, CTA easily demonstrates that is has been financially damaged by Defendants' breach. IKG (Group) owes an outstanding balance of $1,178,312.96 and IKG (USA) owes $991,886.29 for services CTA rendered. (Mem. Supp. at 6.) Under the Terms and Conditions, Defendants also owe CTA Termination Payments, Late Payment Penalties, judgment interest, and attorneys' fees. (T&C §§ 3.6, 3.9, 13.4.)  In total, IKG (Group) owes CTA $4,061,959.80 (not including judgment interest) and IKG (USA) owes CTA $3,769,684.80 (not including judgment interest). (Mem. Supp at. 6-7.)

In sum, Plaintiff has adequately plead a breach of contract claims against Defendants

upon which relief can be granted under Virginia law.

**B.     Alternative Claims for Account Stated (Count II), Unjust Enrichment (Count III), and Quantum Meruit (Count IV)**

Alternatively, CTA brings claims for account stated, unjust enrichment, and quantum meruit. These alternative claims arise from the same obligations as Plaintiff's breach of contract claim. Therefore, because the undersigned finds that Plaintiff has stated a valid breach of contract claim, CTA's alternative claims must be denied so to avoid awarding Plaintiff double recovery. *See CMA CGM S.A. v. Dubitec Am., Inc.*, 2:14CV608, 2015 WL 5837571, at \*4 (E.D. Va. Oct. 2, 2015) (granting default judgment on Plaintiff's breach of contract claim but denying alternative claims for account stated and quantum meruit to avoid double recovery). Nevertheless, the undersigned will address each claim briefly.

1.     Account Stated (Count II)

"When one party received from the other 'a statement of the account between them, showing the exact amount of compensation for his services... and accepted the same without complaint or objection,...such conduct...raises a strong presumption that he had agreed to the correctness of such settlement." *CMA CGM S.A.*, 2:14CV608, 2015 WL 5837571, at \*5 (citing *Goldsmith v. Latz*, 96 Va. 680, 686 (1899)).

Here, CTA delivered numerous invoices to Defendants, which Defendants did not dispute within the time designated under the Terms and Conditions. (Compl. ¶¶ 93-98.) CTA therefore alleges that Defendants accepted the amounts stated on the invoices. (*Id.*) But, the undersigned denies this claim because "a contemporaneous finding of liability based on an account stated would amount to awarding Plaintiff a double recovery[.]" *CMA CGM S.A.*, 2:14CV608, 2015 WL 5837571, at \*5.

13

2.     Unjust Enrichment (Count III) and Quantum Meruit (Count IV)

As CTA noted in its complaint, "under Virginia law, it is well settled that a plaintiff cannot recover under a theory of unjust enrichment where the parties have an express contract that covers the matter at issue." *Id.*; (Compl. n.13.) Similarly, "[t]here can be no recovery in quantum meruit where a valid express contract between the parties exists." *Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.*, 961 F.2d 489, 491 (4th Cir. 1992). The undersigned found above that the parties had an express contract. Moreover, a finding of unjust enrichment or quantum meruit would result in awarding Plaintiff double recovery. Accordingly, the undersigned must deny Plaintiff's unjust enrichment and quantum meruit claims.

### C.     Declaratory Judgment (Counts V-VII)

Next, Plaintiff seeks declaratory judgment that: (1) IKG (Group) and IKG (USA) are jointly and severally liable (Count V); (2) Defendants are alter egos and the corporate veil may be pierced between the two companies (Count VI); and (3) Defendants do not have a right use CTA's storage racks or date warehouses. (Count VII). (Compl. ¶¶ 116-46; Mem. Supp. at 7.)

Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), a district court, in a case or controversy otherwise within its jurisdiction, "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Penn–America Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004). The decision regarding whether to hear a federal declaratory judgment action is discretionary. *Id.* A declaratory judgment action is appropriate "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996).

The Fourth Circuit has set forth factors which might require a district court to decline to entertain a declaratory judgment action. *See Aetna Cas. & Sur. Co. v. Ind-Elec. Co.*, 139 F.3d 419, 423 (4th Cir. 1998). These factors include (1) the general utility of the declaratory relief sought; (2) the strength of the state's interest in having a state court decide the issues raised; (3) whether a state court can resolve the issues more efficiently; (4) any unnecessary entanglement between the federal and state court systems because of overlapping issues of fact or law; and (5) whether the parties are using the declaratory judgment action for 'procedural fencing,' for example, to provide another forum in a race for *res judicata,* or to obtain a federal hearing in a nonremovable case. *Id.*

Here, declaratory judgment will clarify Defendants' liability in this action. None of the above factors weigh against this Court's issuance of declaratory judgment, and the undersigned is unaware of any related state court proceedings. The undersigned will briefly address each request for declaratory relief:

1. <u>Joint and Several Liability (Count V)</u>

The Terms and Conditions provide that:

> Customer's affiliates may purchase Services under this Agreement by submitting an Order…any Customer Affiliate shall be bound to the terms and conditions to the same extent as the Customer; provided, however, that Customer shall be jointly and severally liable for all claims and liabilities arising under this Agreement related to any order accepted from any Customer Affiliate, and any event of default under this Agreement by the Customer Affiliate with respect to such Order shall also be deemed an event of default by Customer.

(T&C § 1.3.) Further IKG (Group) and IKG (USA) are "affiliates" under the Terms and Conditions because they are "at least fifty percent (50%) controlling of, controlled by or under common control with" each other. (Compl. ¶¶ 14, 118; T&C at 14.) Accordingly, declaratory judgment is appropriate here because the parties' agreement clearly provided for joint and

several liability.

2.     Alter Ego Status and Fraud Subject to Veil Piercing (Count VI)

The Fourth Circuit has acknowledged that "veil piercing is an 'extraordinary act to be taken only when necessary to promote justice.'" *Transparent GMU v. George Mason University*, 298 Va. 222, 245 (2019) (quoting *C.F. Trust, Inc. v. First Flight L.P.*, 266 Va. 3, 10 (2003)). Moreover, a court should not disregard a corporate entity "unless it is proved that the corporation is the alter ego, alias, stooge, or dummy of the individuals sought to be held personally accountable and that the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime." *Id.* (Internal citations omitted).

In this case, Plaintiff alleges that IKG (Group) and IKG (USA) were organized by a single individual, Mr. Zhou, who is the CEO if both entities. (Compl. ¶ 128.) IKG (Group) first began ordering services from CTA as Hostspace Networks LLC, and Hostspace's agent for service of process is the same as IKG (USA)'s. (Compl. ¶¶ 127, 129, Exs. C, L.) Further, IKG (Group) directed Hostspace as its affiliate and directed CTA to transfer the Hostspace account to IKG (USA)'s name. (Compl. ¶ 130.) Defendants also make orders through a single email account operated by the same employees, who do not clarify whether they represent IKG (Group) or IKG (USA). (Compl. ¶¶ 131-134.) Accordingly, Plaintiff has alleged that Defendants appear to operate as a single entity, commingling funds and working as alter egos.

Next, Plaintiff points to various news articles and other public internet sources, which state that IKG (Group)'s executives have been detained in China for using the company in violation of China's internet gambling laws. (Compl. ¶¶ 73, 135-136.)

Based on these facts, the undersigned finds CTA is entitled to declaratory judgment that Defendants are subject to corporate veil piercing.

16

3.      Removal of Defendants' Equipment (Count VII)

Finally, CTA seeks declaratory judgment that Defendants no longer have a right to use CTA's storage racks or data warehouses and that CTA has the right to remove all of Defendants' property at Defendants' expense. CTA alleges that Defendants left "servers, switches, routers, firewalls, storage and network equipment and other property" at its Los Angeles data center. (Compl. ¶¶ 139-41.) As explained above, CTA terminated its services to Defendants and the parties no longer have a contract. (Compl. ¶ 142.) Accordingly, declaratory judgment on this basis is appropriate.

IV.  REQUESTED RELIEF

At this juncture, Plaintiff requests that the Court enter default judgment against Defendants for a total of $7,831,644.52, jointly and severally, consisting of: (1) $7,601,764.93 in unpaid balance, Late Penalty Payments, and Termination payments under the parties' agreement; (2) $229,879.59 in attorney's costs and fees; and (3) declaratory judgment that Defendants are joint and severally liable, alter egos subject to veil piercing, and that CTA may remove Defendants' property at Defendants' expense. The undersigned will address each form of relief in turn.

A.      Damages Under the Contract

As explained above, the parties' agreement required Defendants to pay all amounts owed by the Due Date or face termination fees and late payment penalties. Specifically, CTA's Terms and Conditions provided that Defendants were required to make "all undisputed payments on or before the date that is [thirty] (30) calendar days after the invoice date." (T&C § 3.3.) If Defendants failed to pay by the due date, the agreement provided for Late Payment Penalties as follows: "interest on the unpaid balance from the Due Date until the date paid at the nominal rate

17

of 1.0% per month, compounded monthly, or the highest rate permitted by applicable law, whichever is lower." (T&C § 3.6.) Further, the Terms and Conditions provide that:

> Termination Payment. In the case of termination of this Agreement of any Service...by CT Americas under 13.2(i) or 13.3(i) for Customer's Default, Customer shall remain liable to pay CT Americas an amount equal to the [Monthly Recurring Charges] for the remainder of the term of that Service as set forth in the Order ("Termination Payment"), plus any third party charges not already covered by the Termination Payment.

(T&C § 13.4.)

Here, CTA has sufficiently pled that IKG (Group) had an overdue balance of $1,178,312.96 for its unpaid July, August, September, and October 2020 invoices. (Xu Decl. ¶ 5.)[8] Under the Late Penalty Payment provision, IKG (Group) owes CTA interest on its $1,178,312.96 balance at a rate of 1.0% per month. This amounts to $29,697.49 from the date of each invoice to December 18, 2020 (the date of the Complaint). (*Id.*) Additionally, IKG (Group) owes CTA $2,739,009.56 in Termination payments. (*Id.*) This amount accounts for the remainder of the term indicated on IKG (Group)'s service orders. In sum, IKG (Group) owes CTA $3,947,020.01 for breach of their agreement.

Similarly, IKG (USA) owed CTA $991,886.21 for its unpaid July, August, September, and October 2020 invoices. (Xu Decl. ¶ 6.) IKG (USA)'s Late Penalty Payments amount to $24,070.13. (*Id.*) And, IKG (USA) owes Termination Payments in the amount of $2,638,788.58. (*Id.*) Therefore, IKG (USA) owes CTA a total of $3,654,744.92 under the contract.

Accordingly, the undersigned finds that Defendants owe CTA a total of $7,601,764.93 in unpaid balance, Late Penalty Payments, and Termination payments, plus pre-judgment and post-

---

[8] Plaintiff attached its Declaration of Lin Xu, accounts receivable accountant at CTA, as Exhibit A to its Memorandum in Support of Default Judgment ("Xu Decl."). (Dkt. 18-1.)

judgment interest.[9]

### B.   Attorneys' Fees and Costs

Next, Plaintiff requests $229,879.59 in attorneys' fees and costs under the Terms and

Conditions. Parties may contract away the "American rule" for attorneys' fees and instead

"adopt[] provisions shifting fees to the losing party in disputes involving the contract." *Dewberry*

*& Davis, Inc. v. C3NS, Inc.* 723 S.E.2d 239, 243 (Va. 2012). Here, CTA's Terms and Conditions

provide:

> Enforcement. Each Party shall be responsible for all costs and expenses, including
> attorneys' fees and expenses and court costs, incurred by the other Party in the
> enforcement of the payment obligation of any undisputed amounts under this Agreement
> and the collection of outstanding amounts due hereunder.

(T&C § 3.9.) Accordingly, the undersigned finds that Plaintiff is entitled to reasonable fees and

costs incurred in litigating this matter.

In granting an award of attorneys' fees, the court must determine the lodestar figure by

multiplying the reasonable number of expended hours times the reasonable rate. *Robinson v.*

*Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009); *Grissom v. Mills Corp.*, 549 F.3d

313, 320 (4th Cir. 2008). Deciding what is "reasonable" is within the district court's discretion,

but must be guided by the following twelve factors:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions
> raised; (3) the skill required to properly perform the legal services rendered; (4)
> the attorney's opportunity costs in pressing the instant litigation; (5) the customary
> fee for like work; (6) the attorney's expectations at the outset of the litigation; (7)
> the time limitations imposed by the client or circumstances; (8) the amount in
> controversy and the results obtained; (9) the experience, reputation and ability of
> the attorney; (10) the undesirability of the case within the legal community in
> which the suit arose; (11) the nature and length of the professional relationship
> between attorney and client; and (12) attorneys' fees awards in similar cases.

---

[9] The undersigned recommends that post-judgment interest accrue at the rate for federal
judgments on the total judgment amount entered by the Court (including money damages,
accrued interest, and fees and costs).

*Robinson*, 560 F.3d at 243-44. The Court finds that the first, fifth, and eighth factors are those

most pertinent here.

First, the undersigned will address the time and labor expended on this matter. In the

Declaration of Kenneth B. Reisenfeld ("Reisenfeld Decl.") attached as Exhibit B to Plaintiff's

supporting memorandum, Plaintiff requests that the Court award a total of $229,879.59 in

attorney's fees and costs. (*See* Dkt. 18-2.) Plaintiff contends it has incurred a total of

$221,984.72 in attorneys' fees and $7,894.87 in costs. (Reisenfeld Decl. ¶¶ 18-19.) The

requested attorneys' fees cover the fees of five attorneys, an international trade analyst, and two

paralegals Baker & Hostetler LLP. A breakdown of the hours and attorneys' fees is as follows:

| Attorney or Staff | Years of Experience | Hours | Hourly Fee | Total Sum |
|---|---|---|---|---|
| Kenneth B. Reisenfeld | 40 | 134.25 | $816-842 | $111,255.22 |
| Elizabeth A. Scully | 23 | 9.7 | $748-769 | $7,344.85 |
| Bruce R. Green | 40 | 1 | $761 | $760.75 |
| Gary S. Lutzker | 25 | .9 | $676 | $608.17 |
| Brian V. Johnson | 2 | 231.7 | $391-421 | $93,367.40 |
| Sha Zhu | (Analyst) | .3 | $332 | $99.45 |
| Stephen LaFalce | (Paralegal) | 4 | $170 | $680.00 |
| Forrest Williamson | (Paralegal) | 46.2 | $170-174 | $7,868.88 |
| **TOTAL** | - | **428.05** | - | **$221,984.72** |

(*Id.* ¶¶ 4-23.)

The undersigned has reviewed the billing entries for this matter. (*Id.* Ex. 1.) Upon review,

the billing entries and work performed are entirely reasonable. The work included, among other

things, (1) drafting and revising the complaint, request for entry of default judgment, related

declarations, and motion for default judgment and supporting memorandum; (2) corresponding

with and updating the client; (3) translating exhibits from Chinese to English; (4) researching

IKG (USA) and its non-domestic affiliates; and (5) researching international service of process

and serving Defendants. (*Id.*) These actions are precisely what the Court expects counsel to

20

undertake in the process of filing a law suit and obtaining default judgment.

Next, the fifth factor requires the Court to look at customary fees in like work. To aid in this analysis, the Court considers the *Vienna Metro* matrix, which this Court has consistently used in determining customary rates for Northern Virginia attorneys. *JK Moving & Storage, Inc. v. Winmar Constr., Inc.*, No. 1:17-cv-1213 (CMH/TCB), 2018 WL 4365573, at *3 (E.D. Va. June 20, 2018) (*citing Vienna Metro LLC v. Pulte Home Corp.*, No. 1:10-cv-502, Dkt. 263 (E.D. Va. Aug. 24, 2011). The *Vienna Metro* matrix provides for fees as follows:

| Years' Experience | Hourly Rate |
|---|---|
| 20+ years (Mr. Reisenfeld, Ms. Scully, Mr. Greene, Mr. Lutzker) | $505-820 |
| 1-3 years (Mr. Johnson) | $250-435 |
| Paralegal (Ms. Zhu[10], Mr. LaFalce, Mr. Williamson) | $130-350 |

*Id.*

Here, comparing the attorneys' relevant billing rates per hour, respectively – to the above fee estimations, the attorneys' billing rates sit reasonably within each range. Moreover, as Mr. Reisenfeld submits in his declaration, and the Court agrees, the hourly rates Baker & Hostetler charged in this matter are reasonable.

Further, the undersigned finds Plaintiff's submitted costs to be reasonable. Plaintiff claims it incurred a total of $7,894.87 in costs. (Reisenfeld Decl. ¶ 18.) This amount includes automated research and postage and delivery services. (*Id.*)

Finally, the undersigned considers the eighth factor - the amount in controversy and the results obtained. Defendants owed CTA millions of dollars as a result of their breach. Nevertheless, Defendants failed to appear in this matter in any capacity whatsoever. Defendants' failure to defend themselves warrants the award of reasonable costs and fees here.

---

[10] Ms. Zhu is an international trade analyst, not a paralegal. The undersigned agrees with Plaintiff, however, that applying the paralegal rate is appropriate given the needs of this case. (*See* Reisenfeld Decl., n2.)

Upon review of the supporting affidavit and the incurred fees and costs, the undersigned finds that the fees and costs are reasonable. Accordingly, the undersigned recommends that the Court award Plaintiff $229,879.59 in attorneys' fees and costs

### C.    Declaratory Relief

Plaintiff seeks declaratory judgment that Defendants: (1) are jointly and severally liable; (2) share alter ego status such that corporate veil piercing is appropriate; and (3) that Defendants do not have the right to use Plaintiff's storage racks and that Plaintiff may remove Defendants' property at Defendants' expense. As articulated above, declaratory judgment is appropriate in this case. As such, the undersigned recommends that the Court declare that Defendants are jointly and severally liable for the amounts owed to Plaintiffs, are alter egos of one another, and that Plaintiff may remove Defendants' property and is entitled to expenses incurred in doing so.

### V. RECOMMENDATION

For the reasons articulated above, the undersigned recommends that the Court enter an order granting Plaintiff's Motion for Default Judgment (Dkt. 17), thereby entering default judgment in favor of Plaintiff and against Defendants IKG (Group) and IKG (USA). Further, the undersigned recommends that the Court award Plaintiff a total of $7,831,644.52, not including pre-judgment and post-judgment interest, which consists of: (1) $7,601,764.93 in unpaid balance, Late Penalty Payments, and Termination payments under the parties' agreement; and (2) $229,879.59 in attorney's costs and fees.[11] Additionally, the undersigned recommends that the Court grant Plaintiffs declaratory judgment that Defendants are joint and severally liable for the total amounts above, are alter egos subject to veil piercing, and that CTA may remove

---

[11] As explained above, post-judgment interest should accrue at the rate for federal judgments on the total judgment amount entered by the Court (including money damages, accrued interest, and fees and costs).

Defendants' property at Defendants' expense.

## VI. NOTICE

The parties are advised that objections to this Report and Recommendation, pursuant to

28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within

fourteen (14) days of its service. Failure to object to this Report and Recommendation waives

appellate review of any judgment based on it.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

June 2, 2021
Alexandria, Virginia